## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| KEVIN NODINE, CHERYL MORR, and DAVID MEDLOCK, *On Behalf of Themselves and All Others Similarly Situated,* ) ) ) ) ) | |
| Plaintiffs, ) | Case No. |
| ) | **CLASS ACTION** |
| v. ) | **JURY TRIAL DEMANDED** |
| ) | |
| PLAINS ALL AMERICAN PIPELINE, L.P., a Delaware limited partnership, PLAINS PIPELINE, L.P., a Texas limited partnership, and JOHN DOES 1 through 10, ) ) ) ) | |
| Defendants. ) | |

## CLASS ACTION COMPLAINT

COME NOW Kevin Nodine, Cheryl Moor, and David Medlock, individually and on behalf of all similarly situated persons, and for their Class Action Complaint, state as follows, based where applicable upon personal knowledge, information and belief:

### I.    INTRODUCTION

This is a Class Action seeking money damages and other redress arising from the Plains All American Pipeline oil spill occurring in and around Highland, Illinois in 2015 (hereinafter "2015 Highland Oil Spill"). As alleged in this complaint, as a result of Defendants' negligent and reckless conduct, a pipeline fitting burst at one of Defendants' pump stations near Highland, Illinois, causing crude oil to contaminate the surrounding area. The oil contamination caused real and lasting effect on Highland residents' properties and environment. While Defendants made a public apology for the oil spill, they have not compensated the community affected by the oil contamination. Therefore, this Class Action is before this Court to correct a wrong and to provide relief for Plaintiffs.

## II.    PARTIES

1.      Plaintiff, Kevin Nodine, is a citizen of Illinois and resides in Highland, Illinois.

2.      Plaintiff, Cheryl Morr, is a citizen of Illinois and resides in Highland, Illinois.

3.      Plaintiff, David Medlock, is a citizen of Illinois and resides in Highland, Illinois.

4.      Defendant, Plains All American Pipeline, L.P., is a limited partnership formed in Delaware with its headquarters and principal place of business in Texas.  Pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(10), defendant is an unincorporated association deemed to be a citizen of the State where it has its principal place of business and the State under whose laws it is organized.  Defendant is therefore a citizen of Delaware and Texas.

5.      Defendant Plains All American Pipeline, L.P., operates through or on behalf of PAA GP LLC, a limited liability company formed in Delaware with its headquarters and principal place of business in Texas; Plains AAP, L.P., a limited partnership formed in Delaware with its headquarters and principal place of business in Texas that is the sole member of PAA GP LLC; Plains All American GP LLC, a limited liability company formed in Delaware with its headquarters and principal place of business in Texas; Plains GP Holdings, L.P., a limited partnership formed in Delaware that is the sole member of Plains All American GP LLC; and PAA GP Holdings LLC, a limited liability company formed in Delaware with its headquarters and principal place of business in Texas that is the general partner of Plains GP Holdings, L.P. Pursuant to CAFA, 28 U.S.C. § 1332(10), each of these entities is an unincorporated association deemed to be a citizen of the State where it has its principal place of business and the State under whose laws it is organized and are therefore citizens of Delaware and Texas.

6.      Defendant, Plains Pipeline, L.P., is a limited partnership formed in Texas with its principal place of business in Texas. Plains Pipeline, L.P. is a subsidiary of Plains All American

Pipeline, L.P. Pursuant CAFA, 28 U.S.C. § 1332(10), defendant is an unincorporated association deemed to be a citizen of the State where it has its principal place of business and the State under whose laws it is organized.  Defendant is therefore a citizen of Texas.

7.      On information and belief Defendants John Doe 1 through 10, are corporations or partnerships, the names and addresses of residence of which are currently unknown.

8.      Defendants own and operate multiple storage facilities, crude oil pipelines, and pumping stations, including the pumping stating in Highland, Illinois where the 2015 Highland Oil Spill originated.

### III.    JURISDICTION AND VENUE

9.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, which confers upon the Court original jurisdiction over all civil actions arising under the laws of the United States, including the Oil Pollution Act of 1990, 33 U.S.C. § 2701, *et seq.* This Court has supplemental jurisdiction over Plaintiffs' and Class Members' state law claims under 28 U.S.C. § 1367.

10.     In addition, this Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d), because at least one class member is a citizen of a State different from any defendant, there are more than 40 members of the class, and the aggregate amount in controversy exceeds $5 million, exclusive of interest and costs.  Notwithstanding the citizenship of Defendants John Doe 1 through 10, which is presently unknown, the parties are minimally diverse within the meaning of CAFA.

11.     This Court has personal jurisdiction over Defendants because they have sufficient minimum contacts with Illinois, including but not limited to Defendants' ownership and operation of the Highland, Illinois pumping station where the 2015 Highland Oil Spill originated.

12.     Venue is proper in this district under 28 U.S.C. §1391(b) because a substantial part of the events or omissions giving rise to this action occurred in this District. Further, a substantial part of the property involved is situated in this District.

## IV.    FACTS

13.     Highland is a city in Madison County, Illinois, located next to Silver Lake, with a population of approximately 9,860 people.

14.     Silver Lake is a 574-acre waterbody that serves as a water reservoir that also supplies Highland with its drinking water.

15.     Highland also supplies water to the villages of Grantfork, Pierron, and St. Jacob from the lake.

16.     During the morning of Friday, July 10, 2015, a pipeline fitting ruptured or otherwise failed at Defendants' Pocahontas Pump Station, near the border of Bond and Madison Counties in Illinois, causing well over 4,000 gallons of crude oil to spill into the surrounding waterways in and near Highland, Illinois, including into the creek adjacent to David Medlock's property, over which he has exclusive possession, and the lake from which residents of Highland and the surrounding communities of Grantfork, Pierron, and St. Jacob derive their drinking water.

17.     At approximately 7:44 am that morning, a private citizen allegedly discovered the ruptured pipeline fitting and reported the oil spill through an emergency hotline.

18.     At the Pocahontas Pump Station, the pipeline was equipped with a defective leak detection system that failed to set off any alarms when over 4,000 gallons of crude oil spilled into the containment dike, a backup storage container.

19.     Eight days before the oil spill, Defendants were aware that erosion caused leakage between a drain pipe and a catchment berm of the containment dike.

4

20.     Despite having knowledge of the leakage, Defendants failed to make immediate repairs on the containment dike at the Pocahontas Pump Station.

21.     The Pocahontas Pump Station is located in a rural agricultural area, approximately 2.5 miles from the town of Pocahontas, Illinois, and six miles from the Capwood Pipeline that runs from Defendants' Patoka Station to Wood River, Illinois.

22.     Near the Pocahontas Pump Station is a 12-mile stretch of drainage ditches that allow rainwater to flow into Little Silver Creek and then into Silver Lake.

23.     On the day of the oil spill, rainwater was flowing into the drainage ditches.

24.     As the rainwater flowed into the drainage ditches, over 4,000 gallons of crude oil also flowed from the impaired containment dike at the Pocahontas Pump Station to the drainage ditches that led into Little Silver Creek and then into Silver Lake.

25.     When Defendants became aware that crude oil was leaking from the pump station, its personnel attempted twice to close the main pipeline valve located upstream of Pocahontas, but were unsuccessful.

26.     The personnel then applied the main pipeline valve farther upstream at Kaskaskia in attempt to stop crude oil from flowing into Silver Lake.

27.     Crude oil was observed approximately 8 miles away and downstream of the pump station, and crude oil was observed in the upper northern portion of Silver Lake.

28.     Emergency personnel and government regulators responded to the Pocahontas Pump Station to assist in the oil clean up.

29.     After the oil spill, Silver Lake was closed from all recreational uses for approximately twelve days.

30.    The U.S. Department of Transportation Pipeline and Hazardous Material Safety Administration ("PHMSA") shut down the Pocahontas pipeline, finding that continued operation of Pocahontas facility would be hazardous to life, property, and the environment without immediate corrective actions.

31.    On July 14, 2015, the PHMSA issued a Corrective Action Order requiring Defendants to take certain corrective actions to protect the public, property, and the environment in connection with the oil spill.

32.    One of the corrective measures was completing a Root Cause Failure Analysis that outlined the failures or gaps in management or control systems, such as procedures, training, communications, or procurement at Pocahontas Pump Station.

33.    An independent third party, Kiefner and Associates, Inc., completed its investigation and presented its findings and recommendations in a report, Root Cause Failure Analysis, on or about December 11, 2015.

34.    According to the Root Cause Failure Analysis, the following event sequences contributed to crude oil escaping the pump station and entering the Silver Lake: (1) the separation of the tubing connection; (2) the loss of containment; and (3) the failures to close the main line valve.

35.    In addressing the separation of the tubing connection, the Root Cause Failure Analysis identified five potential factors contributing to the tubing separation. First, the pipeline tubing was at or below acceptable dimensional tolerance, which points to deficiencies in engineering specifications, procurement, and technician training at the time of installation. Second, there was an apparent misalignment of the ferrules during assembly or reassembly of the connection, which points to a potential deficiency in worker training at the time of original

installation and at the time of reconnection.  The Root Cause Failure Analysis further noted that there was inadequate selection or oversight of contractors if work was performed by contractors. Third, there was the failure to observe or recognize that the tubing may not have been well-swaged at the time that the connection was undone and reassembled, also a potential training and procedural deficiency. Fourth, the improper size of tubing and fitting was installed throughout the pump station. Lastly, the tubing at the pump station was installed in a loop that required valves to be opened or closed more often than necessary.

36.     In addressing the loss of containment, the Root Cause Failure Analysis identified three factors contributing to the loss of containment.  First, there was an impairment of the containment dike when erosion damaged the interface of the drain pipe and the berm.  The Root Cause Failure Analysis noted that repairs were scheduled, but the repairs were delayed. Second, the heavy rainfall exacerbated the condition of the containment dike. Defendants failed to recognize the risk associated with the impaired containment dike. Lastly, the Root Cause Failure Analysis further noted that Defendants' responses to the oil spill could have been more effective sooner if response equipment had been pre-positioned at Pocahontas Pump Station and if a larger workforce had been present with the initial response.

37.     In addressing the failures to close the main line valve, the Root Cause Failure Analysis identified that a tripped circuit breaker at the pump station disarmed the control of the valve.  It was determined that over cranking the valve caused the programmable logic controller to send a command to disarm the valve.  The Root Cause Failure Analysis also noted that previous failure to close the valve occurred on June 6, 2015. Defendants had no procedure describing the proper valve setting.  The report concluded that the root causes for the over cranking situation were inadequate procedures, inadequate training, and inadequate communications.

38.     The Root Cause Failure Analysis outlined specific instances where Defendants failed to repair and/or maintain the pipelines in a safe condition at the pump station.

39.     Defendants not only had a pattern and practice of shoddy safety and maintenance procedures on their pipelines, they had knowledge that the failure to properly maintain their pipelines creates a substantial threat of a discharge of oil that can cause damage to Plaintiffs and the environment.

40.     This is not the first time Defendants' negligent and unlawful conduct has resulted in a devastating oil spill. On May 19, 2015, Defendants' negligence resulted in a corroded pipeline rupturing and spilling approximately 101,000 gallons of crude oil along the Gaviota coast in Santa Barbara, California (hereinafter "California Oil Spill"). Nearly 21,000 gallons made its way through a storm culvert out into the Pacific Ocean.

41.     On August 10, 2010, the U.S. Environmental Protection Agency and the Justice Department announced that Defendants and several of their operating subsidiaries agreed to spend approximately $41 million to upgrade 10,420 miles of crude oil pipeline operated in the United States. The settlement resolved Defendants' Clean Water Act violations for 10 crude oil spills in Texas, Louisiana, Oklahoma, and Kansas, and required Defendants to pay a $3.25 million civil penalty.

42.     The July 2015 Highland oil spill, California oil spill and other oil spills are clear examples of Defendants putting profit over safety at the expense of innocent people and wildlife as these spills resulted from the unlawful acts and negligence of Defendants, and their failure to properly maintain and inspect their equipment to prevent these spills.

43.     The July 2015 Highland oil spill is particularly disturbing as oil from the spill reached nearby Silver Lake, which is the water source for residents of Highland (population 9,860) and other surrounding communities.

44.     The 2015 Highland oil spill has and will continue to have a detrimental effect on the surrounding environment, wildlife, and properties.   The release of thousands of gallons of crude oil into Silver Lake caused harm to plant and animal communities, soil and groundwater, surface water and sediments, land use, and property values.

45.     In regards to the plant and animal communities, the oil spill has given and will give rise to lasting ecological changes associated with the loss of key organisms serving as specific function which may, to a certain extent, be replaced with others; however, such substitution may not be sufficient to prevent adversely altering the ecosystem dynamics.

46.     In regards to the soil and groundwater, the oil spill has caused and will cause material impact to the watershed including drinking water sources. Additionally, oil contaminated soil has and will continue to release pollutants to the environment.

47.     In regards to the surface water and sediments, the spilled oil and its constituents have migrated and will migrate within surface water laterally and vertically associated with the water movement, solubilization, emulsification and related processes including settlement. The oil contamination becomes entrained in shoreline and bottom sediments and causes harm to the ecosystem.

48.     In regards to land use, the oil spill has created and will create uncertainty and stigma as to the safety of occupying properties affected by the oil spill.

49.     In regards to property values, the oil spill has reduced and will reduce the market value of properties.  Market value is largely based on the attitudes of typical buyers and sellers in

a real estate market.  The potential buyers in a real estate market perceive risk, and it will negatively impact market value regardless of how real or imagined that risk is. The property owners will have to disclose that their properties were affected by the oil spill.

50.      In Highland, there are an estimated 380 residential parcels and 120 agricultural parcels in the impacted area, which are subject to market resistance resulting in diminished property values. The appraisal industry found that residential properties in or near an area affected by an oil spill experienced a reduction in property values in excess of 10%.

51.      As noted above, the nature and extent of the damages caused by the 2015 Highland oil spill are extensive and broad-based. Plaintiffs are seeking compensatory and punitive damages in this case. Punitive damages are warrant because Defendants engaged in wanton or reckless conduct when they failed to make the necessary repairs and/or failed to maintain the pipeline in a safe manner after having prior knowledge of the leakage in the containment dike and the failed closure to the main line valve.

52.      The socioeconomic and environment damages and damages to property values are in the millions. Because the damages are substantial in this case, a class-wide resolution is appropriate.

## V.      CLASS ACTION ALLEGATIONS

53.      Plaintiffs bring claims pursuant to Federal Rule of Civil Procedure 23 on behalf of the class of similarly situated persons. Plaintiffs propose to represent the following class:

> All persons or businesses in the United States that claim economic losses, injuries, and damages to their property, person, occupation, business, and/or health as a result of the oil spill in and around Highland, Illinois in 2015.

54.      The class members are ascertainable and have a well-defined community of interest among their members.

55.     **Ascertainability:** The precise number of members can be ascertained in at least two ways. First, because the members of the proposed Class live in a geographically confined area, providing notice to them via newspapers, trade publications, and other routine avenues of communication will be easily accomplished. Second, Defendants' records –such as logs of complaints from affected class members –will also serve to ascertain potential Class members.

56.     **Numerosity**: The members of the Class are so numerous that joinder of all members would be impractical. The proposed Class likely contains hundreds of members.

57.     **Commonality:** There are common questions of law and fact that predominate over any questions affecting only individual members of the Class.

58.     For Plaintiffs and the Class, the common legal and factual questions include, but are not limited to, the following:

a.  Whether Defendants acted negligently and/or fraudulently to cause the oil spill;

b.  Whether Defendants had installed and maintained adequate safety measures and systems at the Highland, Illinois pump station to prevent the spill;

c.  Whether Defendants conducted adequate supervision that could have prevented the spill;

d.  Whether Defendants conduct constituted violations of statutes, ordinances, regulations, or other laws;

e.  Whether Defendants engaged in unconscionable, deceptive, and/or unreasonable business practices and conduct;

f.  Whether Defendants knowingly, intentionally, or negligently concealed, suppressed, or omitted material facts concerning the safety of its pump station from the public;

g.   Whether Defendants knowingly, intentionally, or negligently concealed, suppressed, omitted, or delayed relaying material facts regarding the spill to local, state, and federal agencies, thereby slowing the response, and/or increasing the damages to Plaintiffs and members of the Class;

h.   Whether the Class suffered injury by virtue of Defendants' negligence, recklessness, carelessness, and/or unconscionable and/or deceptive business practices; and

i.   Whether Defendants are liable to Plaintiffs and the Class, by virtue of state and/or federal law.

59.   **Typicality**: The representative Plaintiffs' claims are typical of the claims of the members of the Class. Plaintiffs and all the members of the Class have been injured by the same wrongful acts and omissions of Defendants. Plaintiffs' claims arise from the same practices and course of conduct that give rise to the claims of the members of the Class and are based on the same legal theories.

60.   **Adequacy of Representation**: Plaintiffs are representatives who will fully and adequately assert and protect the interests of the Class, and have retained class counsel who are experienced and qualified in prosecuting class actions. Neither Plaintiffs nor Plaintiffs' attorneys have any interests contrary to or in conflict with the Class.

61.   **Rule 23(b)(3)**: In addition to satisfying the prerequisites of Rule 23(a), Plaintiffs satisfy the requirements for maintaining a class action under Rule 23(b)(3). Common questions of law and fact predominate over any questions affecting only individual Class members and a class action is superior to individual litigation. The amounts of damages available to individual plaintiffs are insufficient to make litigation addressing Defendants' conduct economically feasible in the

absence of the class action procedure. Individualized litigation also presents a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system presented by the legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economy of scale, and comprehensive supervision by a single court.

62.     **Rule 23(b)(2)**. Plaintiffs also satisfy the requirements for maintaining a class action under Rule 23(b)(2). Defendants have acted or refused to act on grounds that apply generally to the proposed class, making final declaratory or injunctive relief appropriate with respect to the proposed Class as a whole.

63.     **Rule 23(c)(4)**. Plaintiffs also satisfy the requirements for maintaining a class action under Rule 23(c)(4). The claims of Class members are composed of particular issues that are common to all Class members and capable of class wide resolution that will significantly advance the litigation.

## VI.     CAUSES OF ACTION

### COUNT I
### Violation of the Oil Pollution Act of 1990, 33 U.S.C. § 2701 et seq.

64.     Plaintiffs incorporate by reference each and every prior and subsequent allegation of this Complaint as if fully set forth herein.

65.     The Federal Oil Pollution Act ("OPA") provides that "each responsible party for…a facility from which oil is discharged…into or upon the navigable waters or adjoining shorelines…is liable for the removal costs and damages…that result from such incident." 33 U.S.C. § 2702(a).

66. OPA's accompanying regulations state that OPA's goal "is to make the environment and public whole for injuries to natural resources and services resulting from an incident involving a discharge or substantial threat of a discharge of oil (incident)." 15 C.F.R. § 990.10.

67. Recoverable damages include "injury to, or economic losses resulting from destruction of, real or personal property" and "the loss of profits or impairment of earning capacity due to the injury, destruction, or loss of real property, personal property, or natural resources." § 2702 at (b)(2)(B) & (E).

68. The Act defines "facility" as including a "pipeline" used for transporting oil. 33 U.S.C. § 2701(9).

69. In the case of a discharge of oil from a pipeline, the "responsible party" is "any person owning or operating the pipeline." *Id.* at (32)(E).

70. Defendants are the owners and/or operators of the pipeline and pump station at issue in the cause of action, and are thus the "responsible party."

71. Crude oil is "oil" within the meaning of Section 1001(23) of OPA, 33 U.S.C. § 2701(33).

72. On or about July 10, 2015, in Highland, Illinois, oil was discharged within the meaning of Section 1001(23) of OPA, 33 U.S.C. § 2701(33).

73. Prior to and leading up to the rupture of the pipeline on July 10, 2015 (and at any time thereafter to the extent Defendants attempted to operate the pipeline without adequate repair and maintenance), as a result of Defendants' failure to properly maintain the pipeline, Defendants' facility posed the substantial threat of discharge of oil into or upon the navigable waters and/or adjoining shorelines.

74. As a result, Plaintiffs and members of the Class have suffered and will continue to suffer damages to real property, economic losses, and impairment of their use and enjoyment of real property as a result of the discharge of oil from Defendant's pipeline and pump station.

75. Defendants are responsible for compensating Plaintiffs and members of the Class for the current and future harm and damage, removing the oil from their real property and the surrounding environment, restoring the properties and natural resources harmed and/or destroyed as a result of Defendants' oil spill, and ensuring that oil is not moved through the pipeline or pump station and near neighboring properties without adequate safety mechanisms to prevent future spills and regular monitoring.

76. Plaintiffs satisfied the presentation requirement under the OPA, 33 U.S.C. § 2713. Further, Plaintiffs issued a Demand for compensation on October 18, 2016. As of today, compensation has been denied. Defendants have not settled the claim within 90 days after the date upon which the claim was presented.

**COUNT II**
**Trespass**

77. Plaintiffs incorporate by reference each and every prior and subsequent allegation of this Complaint as if fully restated here.

78. Defendants discharged a polluting matter on Plaintiffs' and Class Members' real property in such a manner that, it was reasonably foreseeable that the pollutant would, in due course, invade Plaintiffs' and Class members' real property and cause harm.

79. By discharging polluting matter, Defendants entered, invaded, and intruded on the real properties of Plaintiffs and the Class members without privilege, permission, invitation, or justification. Plaintiffs and the Class members have exclusive possession of their property, which was invaded by the Defendants.

80.    Plaintiffs and the Class members' property were affected by the oil contamination when polluting matter entered upon the surface of their land.

81.    Defendants had a duty to use reasonable care not to enter, intrude on, or invade Plaintiffs' and Class members' real properties. Defendants also owed a duty to Plaintiffs and members of the Class to exercise reasonable care in the manufacture, maintenance, and operation of their pipeline and pump stations.

82.    Defendants had a heightened duty of care to Plaintiffs and the Class because of the great danger associated with transporting, storing, pumping, and otherwise handling and exercising control over flammable, hazardous, and toxic oils near to residential areas and nearby real properties in and near Highland, Illinois.

83.    Defendants breached the duty they owed to Plaintiffs and members of the Class when they failed to exercise reasonable care in the manufacture, maintenance, and operation of their pump station, which conduct resulted in entry, intrusion, or invasion on Plaintiffs' and Class Members' real properties.

84.    Defendants knew or should have known that their conduct would foreseeably result in a disastrous oil spill, causing damage to the real properties and economic interests of persons in the area affected by the spill.

85.    As a direct and proximate result of Defendants' trespass, Plaintiffs and Class Members have suffered legal injury and damages, in an amount to be proven at trial, including, but not limited to, property damage, diminution of value of real estate, loss of income and other economic loss.

86.    Defendants' wanton or reckless conduct, as described herein, entitles Plaintiffs and Class members to punitive damages.

## COUNT III
### Negligence

87.    Plaintiffs incorporate by reference each and every prior and subsequent allegation of this Complaint as if fully restated here.

88.    Defendants owed a duty to Plaintiffs and the Class to exercise reasonable and ordinary care. That duty arose from, among other things, federal, state, and local laws that require Defendants to operate a pipeline and pump station in a manner that does not damage public health and safety.

89.    Defendants breached that duty to Plaintiffs and the Class by, among other things, locating their pumping station above the grade of nearby waterways that flow into creeks and ultimately, the Silver Lake reservoir; by failing to properly inspect and maintain the pumping station; by failing to install reasonable safety equipment to prevent a spill; and by failing to promptly respond to and contain the spill.

90.    Defendants, in the exercise of reasonable care, should have known that a fitting at their pump station could rupture or otherwise fail and spill significant amounts of oil.

91.    In the alternative, the Highland pumping stating and connected oil pipelines and equipment was, at all relevant times, under defendants' exclusive control and management, and the damages alleged herein would not have occurred in the normal course of events had defendants used ordinary care.  As such, defendants are liable pursuant to the doctrine of *res ipsa loquitur.*

92.    As a direct and proximate result of Defendants' negligence, Plaintiffs and the Class have sustained damages.

## COUNT IV
## Negligence Per Se

93.     Plaintiffs incorporate by reference each and every prior and subsequent allegation of this Complaint as if fully restated here.

94.     At all times herein mentioned, Defendants negligently, wantonly, carelessly and/or recklessly maintained and operated their pump station in Highland, Illinois.

95.     Defendants' actions and/or inactions are violations of the Oil Pollution Act of 1990, 33 U.S.C. § 2701 *et seq.*

96.     Because Plaintiffs have alleged violations under the strict liability statute (Oil Pollution Act), Defendants are also liable under a negligence per se claim.

97.     As a direct and legal cause of the Defendants' wrongful acts and omissions herein above set forth, Plaintiffs and the Class have suffered and will suffer economic harm, injury, and losses.

98.     Plaintiffs' harm resulted from the occurrence of the nature that the laws listed above were designed to prevent, and Plaintiffs are a member of the class of persons for whose protection those laws were adopted.

99.     The acts and omissions of Defendants, and each of them, were done with malice, fraud, and/or oppression as described in this Complaint.

## COUNT V
## Public Nuisance

100.    Plaintiffs incorporate by reference each and every prior and subsequent allegation of this Complaint as if fully restated here.

101.    Defendants have created a condition that is harmful to health and interferes with the comfortable enjoyment of life and property by discharging crude oil onto the properties and waterways in and near Highland, Illinois.

102.    That nuisance affects a substantial number of individuals similarly situated to the Plaintiffs, such as residents and visitors to Highland, Illinois and Silver Lake, and businesses that rely on the safe and healthy environment in the county.

103.    The oil spill is a condition which would reasonably annoy and disturb an ordinary person, as shown by, for example, the potential health impacts of the spill, the community outrage in response to the spill, and the nationwide interest in the spill's impact's on the area and its water supply.

104.    The seriousness and gravity of that harm outweighs the social utility of Defendants' conduct. There is no social utility associated with releasing crude oil into the waterways in Highland, Illinois.

105.    Plaintiffs and the Class suffered harm and injury to their properties, businesses, and health, which they did not consent to and which is different from the type of harm suffered by the general public.

106.    The above acts and omissions also created a public nuisance *vis-à-vis* the Plaintiffs and the Class, interfering with the property rights of Plaintiffs and the Class, and rights incidental to those property rights.

107.    As a direct and legal cause of Defendants' wrongful acts and/or omissions herein above set forth, Plaintiffs and the Class have suffered and will suffer economic harm, injury, and losses as herein above set forth.108.  To remedy the harm caused by Defendants' nuisance,

Plaintiffs will seek public injunctive relief, including, but not limited to, an order requiring Defendants to restore the waterways and properties impacted by the spill.

109.    In maintaining the nuisance, which is ongoing, Defendants are acting with full knowledge of the consequences and damage being caused, and the acts and omissions of Defendants, were done with malice, fraud, and/or oppression as described in this Complaint.

## COUNT VI
## Continuing Private Nuisance

110.    Plaintiffs incorporate by reference each and every prior and subsequent allegation of this Complaint as if fully restated here.

111.    Defendants' actions and inactions caused, maintained, and/or permitted the contamination alleged in this action by its negligence, intentional or otherwise, actionable acts, and/or omissions.

112.    Defendants created the contamination at issue, which is harmful to both human health and the environment and interferes with Plaintiffs' comfortable use and enjoyment of the real property in which they have a possessory interest.

113.    Defendants were, at all relevant times, in sufficient control of the Highland, Illinois pump station to have known of the threatened release of oil and associated hydrocarbons and to have prevented the resulting contamination. Defendants knew or should have known that their operation of the failed pump station would have, and did, cause the contamination described herein.

114.    Despite knowledge and forewarning, Defendants failed to take reasonable steps to prevent the failure which resulted in the contamination at issue and have failed to take reasonable steps to abate the contamination.

115.    Plaintiffs did not consent to the ongoing damage to the use and enjoyment of their property as a result of Defendants' actions and inactions. 116. After having a reasonable opportunity to do so, Defendants failed to take reasonable measures to properly abate the contamination described herein.

117.    As a direct and proximate cause, Defendants' acts and omissions have caused substantial actual damage and immediate and ongoing diminution of the value of Plaintiffs' real property and the property of the Class.

118.    As a result, Plaintiffs have and will continue to suffer damages, both economic and otherwise.

119.    Plaintiffs are informed and believe, and on that basis allege, that the contamination is continuing and abatable.

120.    As a proximate result of the nuisance, Plaintiffs have and will continue to suffer damages.

## V. EQUITABLE REMEDIES
### Permanent Injunction

121.    Plaintiffs incorporate by reference each and every prior and subsequent allegation of this Complaint as if fully restated here.  In this case, Plaintiffs and the Class are seeking equitable remedies because the violations are ongoing.

122.    Defendants, and each of them, wrongfully and unlawfully caused oil to spill out of their pump station located in Highland, Illinois, onto surrounding areas, into the nearby waterways, and onto Plaintiffs' and Class members' properties. These activities were allegedly discovered on or about July 10, 2015 and are continuing to the present time.

123.    In the absence of an injunction, Defendants will continue to violate the rights of Plaintiffs and the Class. Defendants, and each of them, have refused and still refuse to refrain from their wrongful conduct.

124.    Defendants' wrongful conduct, unless and until enjoined and restrained by order of this Court, will cause great and irreparable injury to Plaintiffs and the Class.

125.    Plaintiffs and the Class have no adequate remedy at law for the injuries that will result from failure of the Defendants to safely operate their pipeline and pump station and it could be impossible for Plaintiffs and the Class to determine the precise amount of damages they will suffer if Defendants' conduct is not restrained and Plaintiffs are forced to institute a multiplicity of suits to obtain adequate compensation for injuries and harm to real property. As a result, Plaintiffs and the Class are seeking injunctive relief.

## **PRAYER FOR RELIEF**

Plaintiffs, individually and on behalf of all others similarly situated, request judgment against Defendants as follows:

A.    For an order certifying the Class and appointing Plaintiffs as representatives of the Class and appointing the lawyers and law firm representing Plaintiffs as counsel for the Class;

B.    Permanently enjoining Defendants from operating a pipeline and pump station in Highland, Illinois without adequate safety and response measures;

C.    For all recoverable compensatory, statutory, and other damages sustained by Plaintiffs and the Class, including disgorgement, unjust enrichment, and all other relief allowed under applicable law;

D.    Granting Plaintiffs and the Class awards of restitution and/or disgorgement of Defendants' profits from its unfair and unlawful practices described above;

E.      For costs;

F.      For both pre-judgment and post-judgment interest on any amounts awarded;

G.      For appropriate injunctive relief, including public injunctive relief; *i.e.*, an order requiring Defendants to restore properties and waterways effected by the spill;

H.      For treble damages insofar as they are allowed by applicable laws;

I.      For appropriate individual relief as request above;

J.      For payment of attorneys' fees and expert fees as maybe allowable by law;

K.      For exemplary or punitive damages as allowable by law for the oppression, fraud, and malice alleged above; and

L.      For such other and further relief, including declaratory relief, as the Court may deem just and proper.

## <u>JURY DEMAND</u>

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of any and all issues in this action so triable by right.


Respectfully submitted,
THE DRISCOLL FIRM, P.C.


BY:    ___/s/ John J. Driscoll_____
John J. Driscoll, #6276464
john@thedriscollfirm.com
Christopher J. Quinn, #6310758
chris@thedriscolfirm.com
211 North Broadway, Suite 4050
St. Louis, Missouri 63012
Telephone No. (314) 932-3232
Fax No. (314) 932-3233