## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| CHERYL MORR and | ) | |
| DAVID MEDLOCK, | ) | |
| On Behalf of Themselves and | ) | |
| All Others Similarly Situated, | ) | |
| | ) | |
| Plaintiffs, | ) | No. 3:17-cv-00163-SMY-GCS |
| | ) | |
| v. | ) | |
| | ) | |
| PLAINS ALL AMERICAN PIPELINE, | ) | |
| L.P., and   PLAINS PIPELINE, L.P., | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR CLASS CERTIFICATION**

COME NOW Cheryl Morr and David Medlock, individually and on behalf of all similarly situated persons, and for their Memorandum in Support of Motion for Class Certification state as follows:

## I.    INTRODUCTION.

On the morning of July 10, 2015, a pipeline and associated equipment owned by Plains All American, L.P. and Plains Pipeline, L.P. ("Plains") failed.  The resultant discharge of thousands of gallons of heavyweight crude oil caused significant environmental and property damage, and, as a direct consequence, harm to members of the proposed class.  Later independent investigation ordered by the U.S. Department of Transportation Pipeline and Hazardous Materials Safety Administration ("PHMSA") determined several failings by Plains were the root cause of the Silver Lake crude oil spill, including failure of a containment dike which was already known to Plains to be failing.

1

The Supreme Court has acknowledged that single-incident environmental disasters are proper candidates for class certification in *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997); has affirmed as unremarkable the class action trial of actual and punitive damages claims arising from the Exxon Valdez oil spill in *Exxon Shipping Co. v. Baker*, 128 S. Ct. 499 (2007); and, more recently, has denied review of challenges to the Rule 23(b)(3) class action settlement of both economic and medical claims arising from the Deepwater Horizon Oil Spill.  *In re Oil Spill by Oil Rig Deepwater Horizon in Gulf of Mexico, on Apr. 20, 2010*, 910 F. Supp. 2d 891, 926 (E.D. La. 2012), *aff'd sub nom. In re Deepwater Horizon*, 739 F.3d 790 (5th Cir. 2014), *cert denied*, 135 S. Ct. 754 (2014). This is because the heart of each class member's complaint—the single disaster—is common to all class members.

As set forth below, the legitimate private interests of the litigants, the institutional interests of this Court in judicial economy and efficient case management, and the public interest in courts that function with consistency and impartiality, all support the class action mechanism as superior relative to the alternatives available under the Federal Rules "for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

## II.      BACKGROUND / NATURE OF THE CASE.

Plains is a prolific polluter.  Indeed, a mere two months before the contamination giving rise to this case, Plains spilled an estimated 142,800 gallons of crude oil into the Santa Barbara, California ecosystem at ultimate costs estimated by Plains itself to approach $257,000,000. Wikipedia, "Refugio oil spill," Ex. 1[1] at 1, 4.  Plains was criminally convicted of a felony and several misdemeanors for its conduct.  September 7, 2018 Press Release, State of California

---

[1] Plaintiffs are filing all exhibits under separate index.

Department of Justice, Ex. 2 at 2.  Plains has polluted several other United States communities as well.

Here, Plains owns and operates the Capwood pipeline system, a 20-inch crude oil pipeline system Plains uses to transport crude oil between Patoka, Illinois and Wood River, Illinois.  Kiefner & Assoc. December 11, 2016 Failure Analysis ("Kiefner Rept.," explained further shortly), Ex. 3 at PLA004513.  The system was built by Shell Pipeline Company in the 1950's and acquired by Plains in 2003.  Kiefner Rept., Ex. 3 at PLA004513.

This case involves the Pocahontas pump station, located on the Capwood line.  The Pocahontas pump station is located in the Silver Lake Reservoir area, and thus classified as potentially affecting a High Consequence Area ("HCA") by PHMSA.  PHMSA July 16, 2105 Amended Corrective Action Order ("ACO"), Ex.4 at PLA002978-79.

On Friday, July 10, 2015, Plains spilled an estimated 4,200 gallons (100 barrels) of heavyweight crude oil into the environment around Silver Lake.  Plains was not even aware of the spill when it occurred; it had to be reported by area residents.  The crude oil from the Plains spill traveled approximately 8 miles at a minimum (as the crow flies) – through a 12-mile stretch of ditches, into Little Silver Creek, and then finally into Silver Lake.  U.S. EPA Pollution Report 1, Ex. 5 at Nodine 00038.  *See also*  Exhibit 6 (flow path maps and diagrams).  By Plains' own admission,[2] at a minimum 1,848 gallons (44 barrels) were never recovered.  PHMSA Incident Report, Exhibit 7.

Silver Lake serves the area and its residents as water recreation and park recreation, among other things.  U.S. EPA Pollution Report 1, Ex. 5 at Nodine 00038.  Plains' crude oil spill

---

[2] As the merits of the case are not adjudicated on a motion for class certification, for the sake of economy Plaintiffs herein may adopt Plains' own position on some topics *arguendo*, and without further attribution, in order to avoid needless debate.  Accordingly, nothing herein should be taken as a judicial admission, and Plaintiffs reserve the right to adduce additional evidence on all topics at the appropriate time.

impacted all of these activities.  The crude oil pollution also killed many different types of area wildlife.  CTEH Wildlife Observation Report, Ex. 20 at Highland-FOIA000278-283.  To date, Plains has not conducted an Ecological Risk Assessment to measure the full extent of the damage.

Plains could have, and should have, avoided this tragedy altogether.  Among other things, PHMSA's Amended Corrective Action Order required Plains to complete a Root Cause Failure Analysis ("RCFA" or "RCA") by an independent third party. ACO, Ex. 4 at PLA002983. Kiefner and Associates, Inc. ("Kiefner") was selected to perform this role, and ultimately issued a written Failure Analysis.  Kiefner Rept., Ex. 3.

Kiefner's Failure Analysis detailed several root cause failures by Plains.  First, the spill originated from a separated tubing.  Kiefner Rept., Ex. 3 at PLA004514.  Plains not only failed to properly recognize this risk specifically, it also had deficiencies in its company-wide integrity management program.  Kiefner Rept., Ex. 3 at PLA004517.

Perhaps even worse, Plains greatly exacerbated the damage due to its failure to properly maintain containment as the site.  Pocahontas Station was constructed with a containment dike. Kiefner Rept., Ex. 3 at PLA004516.  On July 2, 2015 – over a week before this catastrophe occurred – Plains knew that this containment dike had failed integrity due to erosion.  Kiefner Rept., Ex. 3 at PLA004516.  Plains did not promptly repair the dike.  Despite knowing the dike had failed integrity, Plains did not simply stop flow through the station, either.  Kiefner Rept., Ex. 3 at PLA004518.[3]

_____

[3] This is particularly egregious as Kiefner further concluded that there was little reason for Plains to  flow oil through the Pocahontas pump station in the first place – yet another failure by Plains.  The pumps themselves had been rendered unnecessary and had long been idled by Plains.  Kiefner Rept., Ex. 3 at PLA004513; 4517.  The only reason to expose the station to crude oil flow was access to a gravitometer; a convenience.  Kiefner Rept., Ex.3 at PLA004513.  Thus:  "Access to the gravitometer is the only reason why flow is maintained through Pocahontas, and doing so necessitates operational steps and subjects equipment to operational events that would otherwise be

Plains was required by the federal and state authorities to attempt to mitigate this emergency. This was no small task. Given the size of the spill and the geographical scope of the contamination, the initial response *alone* required:

- More than 200 response personnel

- 2,700 feet of boom deployed, with 7,100 additional feet available

- 8 vacuum trucks

- 17 response vessels

- A helicopter for observation overflights.

*See* Plains MP 29 Incident Response Update #3, Ex. 24.

Plains' government-mandated cleanup attempts lasted for many months. The Illinois EPA did not issue a Return to Compliance letter to Plains until April 15, 2016 ("ILEPA Letter," Exhibit 8). Even then, Plains' status was (and is) conditional. The Illinois EPA expressly stated that its conclusion was predicated on limited information: "We have evaluated the information provided in [Plains'] submittal and the information currently in our file, including your previously submittals. On that basis it appears that the activities taken have resulted in addressing the causation and remediation issues associated with this release." *Id.* (alteration and emphases supplied). Relevant to this lawsuit, the Illinois EPA also warned Plains: "Notwithstanding, should information become available which indicates that conditions differ from those reflected in the current evaluation, the Illinois Environmental Protection Agency may require additional actions." *Id.*

## III.   EXPERT EVIDENCE

---

unnecessary. . . . Thus a root cause could be considered a failure to perceive risk associated with unnecessary operations." Kiefner Rept., Ex. 3  at PLA004517.

In support of their motion to certify a class in this matter, Plaintiffs have retained several expert witnesses:  Randall Bell, Ph.D., MAI; Gary Rand, Ph.D.; and Craig Meier, P.E.[4]  As will be seen, Plaintiffs' proposed definition of class size/area and damages methodology come directly from the work of these professionals, particularly Dr. Bell.

### A.  Dr. Randall Bell, Ph.D., MAI

### 1.    Credentials

Dr. Bell is both an economist and also a Member of the Appraisal Institute, the highest achievement available to an appraiser.  Bell Rept., Ex. 9 at 1.  Dr. Bell specializes in real estate damage economics and valuation.  Bell Rept., Ex. 9 at 12-22.  Without exaggeration, he could credibly claim to be one of the country's foremost authorities on this subject.  Dr. Bell literally wrote one of the Appraisal Institute's principal books on the topic:  RANDALL BELL, REAL ESTATE DAMAGES: APPLIED ECONOMICS AND DETRIMENTAL CONDITIONS (3rd ed. 2016).  Dr. Bell has authored and contributed to many other books in this area as well.  Bell Rept., Ex. 9 at 13.

Dr. Bell arrives at this expertise by extensive practical experience and research. Formerly, he led the national real estate damages practice at Price Waterhouse and PriceWaterhouseCoopers.  Bell Rept., Ex. 9 at 13.  Among hundreds of assignments handled by Dr. Bell, *see e.g.* Bell Rept., Ex. 9 at 14-18, Dr. Bell was retained by the Lower Manhattan Development Corporation (created by the City and State of New York) in the World Trade

---

[4] The Declaration, Deposition, and Rebuttal Report of Dr. Bell have been attached as Ex.9-11 respectively; the Report, Deposition, and Rebuttal Report of Dr. Rand have been attached as Ex.12-14  respectively; the Report and Deposition of Craig Meier have been attached as Ex. 15-16 respectively.

Plaintiffs' experts were provided with hundreds of underlying documents which they reviewed and/or which informed their conclusions.  These were equally provided to Defendants as well, of course.  For the sake of judicial economy Plaintiffs will not submit these voluminous documents to the Court contemporaneously, but respectfully request reservation of the right to so do in the future should it be necessary or beneficial.

Center attack; by Murphy Oil Company[5] with respect to Hurricane Katrina; and by the Nuclear Claims Tribunal regarding the Bikini Atoll Nuclear Test sites; respectively the largest terrorist, climate, and environmental cases in modern history.  Bell Rept., Ex. 9 at 2, 14.

### 2.   Professional standards: USPAP and AO-9

### a.   Professional standards explained

USPAP governs the real estate appraisal profession.  As Dr. Bell explains:

> USPAP is an acronym[,] it stands for Uniform Standards of Professional Appraisal Practice.  It was developed a very long time ago. I got into this profession in the mid-1980s, and it existed before that. It was originally published by the Appraisal Institute of which I am a member.

> And then later, and I forget the year, I think it was the mid-1990s, but I could be wrong, there was an act of congress, the Appraisal Foundation was established, and through a process I don't really know the -- the rights or USPAP or copyrights, whatever, were passed from the Appraisal Institute to the new organization created by congress called the Appraisal Foundation. And it has been subsequently updated several times.

> Essentially, they are the regulations for appraisers, licensed appraisers, to abide by in real estate valuation measures. There are sections on how to conduct an appraisal and then the reporting requirements. There's a number of definitions. There's a section on real estate appraisal. There's a section on business appraisal. There's a section on mass appraisal. Again, those are Sections 5 and 6.

> There's also, towards the back of the document, advisory opinions on specific issues; and they keep getting added to. AO-9 is, particularly, relevant to this case, because we are talking about an environmental case.

Bell Depo., Ex. 10 at 314.

USPAP Advisory Opinion 9 ("The Appraisal of Real Property That May Be Impacted by Environmental Contamination"), often called "USPAP AO-9" or simply "AO-9," is a keystone document of USPAP governing valuation issues and, specifically, environmental issues.  USPAP

---

[5] "According to the U.S. Coast Guard, there were about 44 oil spills in the area affected by Hurricane Katrina, though most occurred in areas of Plaquemines Parish which do not have large populations.  The Murphy Oil USA spill was the exception."  Wikipedia, https://en.wikipedia.org/wiki/Murphy_Oil_USA_refinery_spill, last accessed January 7, 2019.

AO-9, Ex. 17; Bell Depo., Ex. 10 at 10.

Significantly for purposes of this case, USPAP AO-9 classifies four separate categories of potentially impacted[6] areas:  Source, Non-source, Adjacent and Proximate.  AO-9, Ex. 17 at lns. 90-93.  Those categories are classified as follows:

> Source sites are the sites on which contamination is, or has been, generated. Non-source sites are sites onto which contamination, generated from a source site, has migrated. An adjacent site is not contaminated, but shares a common property line with a source site. Proximate sites are not contaminated and not adjacent to a source site, but are in close proximity to the source site.

AO-9, Ex. 17 at lns. 90-93.

By USPAP's very definition, then, two of the four categories of properties potentially impacted by contamination are properties which were not themselves ever contaminated. USPAP AO-9 reiterates this in its definition of "Impaired Value": "The market value of the property being appraised with full consideration of the effects of its environmental condition and the presence of <u>environmental contamination on, adjacent to, or proximate to the property</u>."  AO-9, Ex. 17 at lns. 80-82.

USPAP – and environmental damages appraisal generally – also broadly categorizes three types of loss:  Cost, Use, and Risk.  Bell Depo. 34-35.  Again speaking broadly, Costs are things such as cleanup/remediation costs.  Use is the impaired ability to enjoy the property or associated amenities.   Risk is also nicknamed stigma, and more of a permanent issue of diminution of value.  Bell Depo., Ex. 10 at 35-37.

### b.  Use losses due to the Silver Lake oil spill

---

[6] When Defendants, their experts, or others use the term "impacted" – perhaps to conclude "there was no impact" or "minimal impact" – the Court should be very cognizant of who is using that term, and how they define it.  As set forth, per USPAP and the other standards governing the profession, significant "impact" can occur even where physical contamination is wholly absent.  This may include, for example, loss of a premium as further discussed below.  See also Bell Depo., Ex. 10 at 154-56.  Defendants' witness seldom if ever accord the term "impacted" the scope mandated by USPAP.

Dr. Bell currently views loss of use as the predominant issue in this case.  Bell Depo., Ex. 10 at 35-39; 26-27; 202-04.[7]  Use losses can include numerous potential impacts, including impaired use or enjoyment of geographic amenities such as a water feature (lakes, oceans, *etc.*). Bell Depo., Ex. 10 at 37-39.

There is ample professional literature establishing that people pay premiums to enjoy water features such as a lake.  Bell Depo., Ex. 10 at 37-39.  People who live directly on the water may pay a higher premium, but others in the community often pay premiums as well, and can also be damaged:

> However, that's not to say that properties inland from that shoreline aren't damaged, as well.  <u>Because people buy – they don't just by the home, they buy the community.</u>
>
> And if the community includes a big beautiful lake like what I saw with Silver Lake, they can be damaged, as well, because they paid a premium to enjoy that water feature, whether it be fishing, hunting, you know, using it for boating and recreation or just knowing its available for grandkids to come over and enjoy it at some time.  You know, would expect property – the premium to extend beyond just the properties fronting the water, if you – if I've explained that correctly.

Bell Depo., Ex. 10 at 38-39 (emphasis supplied).  *See also* Bell Depo., Ex. 10 at 102, 104-106.

### c.  No individual issues are presented under USPAP

However, this is <u>absolutely not</u> to say that varying personal preferences or tastes present individual appraisal or valuation issues.  No individual inquiry need be made.  Individual preferences or divergent tastes are utterly irrelevant under USPAP and the other standards governing valuations:

> [Defense Counsel]:  In terms of disturbance of the amenity of the ability to use the lake, does it matter whether the particular property owner ever in their lifetime used the lake?
>
> A.  No, it really doesn't.  Because the germane issue is to recognize that people

---

[7] Although costs and/or risk could present themselves on further facts.  *Id.*

pay premiums in communities that have these water features as compared to an otherwise similar property that does not have the water feature. Whether you use it or not is immaterial.

I can't go to Newport Beach and go to an oceanfront property and say, Well, you know what, I never intend on going to the beach, so instead of paying $20 million house -- $20 million for your house, I want to pay [$]800,000 because that's what I can buy a similar property for in Riverside. You'd be -- you'd be laughed out of the house.

So whether you use it or not, doesn't alter what you pay for it whether you use it or not.

Bell Depo., Ex. 10 at 44-45 (alterations supplied).

Accordingly: "[Loss of use] may have more of an effect to you personally or psychologically, but I'm not measuring person or psych – psychological damage. I am measuring real estate damage. . . . The question is what did you – what is that – the right to use that amenity worth? What was paid for that incremental – what was paid incrementally higher for that, and how long was it taken away? And from there, it's pretty simple math to compute the damage." Bell Depo., Ex. 10 at 160. See also Bell Depo., Ex. 10 at 164-65.

### 3.    Mass appraisal methodologies explained

Based on the USPAP standards and literature described above and throughout his report, Dr. Bell states he can reliably assess the damages (if any) suffered by the area residents / proposed class in this case using regression studies and other methods approved by USPAP. Bell Rept., Ex. 9 at 6-8. Those methods, as applied to determine damages for the proposed class of residential properties in this case, are straightforward. *Id.* at 10. The common characteristics of the real estate market and that market's reaction to a common contaminant can be evaluated on an area-wide basis. *Id.* Dr. Bell has performed similar regression analyses numerous times. For example, he has conducted statistical regressions involving contaminated residential real estate in multiple markets including California, Nevada, Missouri, Michigan, Texas, New Jersey, Rhode

Island, Hawaii, Alabama, Florida, Mississippi, and the Marshall Islands. *Id.*

### a.  General methodology

As Dr. Bell explains, it is well-recognized in the appraisal literature that there are generally-accepted appraisal techniques to analyze properties affected or potentially affected by contamination, or proximity to contamination. Bell Rept., Ex. 9 at 5-6. USPAP sets forth guidelines to address the impact to properties of varying proximity to contamination. Bell Rept., Ex. 9 at 9-10.

Mass appraisal is one of the methodologies Dr. Bell will use. Bell Rept., Ex. 9 at 6-8. Mass appraisal is defined as "The process of valuing a universe of properties as of a given date using standard methodology, employing common data, and allowing for statistical testing (USPAP, 2016 – 2017 ed.)." *Id.* at 6. Mass valuations of real estate have been established in the mainstream of the appraisal profession since at least the 1950's and 60's. *Id.*

Mass appraisal methodologies often include regression models or studies, including multiple regressions which use and account for multiple independent variables. Bell Rept., Ex. 9 at 7. Independent variables may include features such as square footage, lot size, age, and room counts, as well as pools, views, or other amenities. *Id.* [8] In other words, multiple regressions specifically account for a theoretically unlimited number of variables. *Id.* at 7. They can also facilitate studying several test and control neighborhoods. *Id.*

With residential properties, a mass appraisal technique is not only efficient, but also appropriate and advantageous. Bell Rept., Ex. 9 at 7. Independent variables account for the various differences and can be reliably calculated. *Id.* Thus, all class properties, including those in pockets with more limited market data, can benefit from the large amounts of data and the

---

[8] Dr. Bell elaborated the mechanics and technicalities of such analyses in greater depth and detail throughout his deposition, but for a decent overview, the Court may see Bell Depo., Ex. 10 at 165-77 and 192-197.

study as a whole.  *Id.*  Accordingly, characteristics such as quality, type, size, age, and variances in levels of contamination do not change the substantial common elements in evaluating impacts of contamination on a class of residential properties such as the class residential properties in this case.  *Id.*

### b. Geographic scope: Pocahontas, Grant Fork, and Highland

Here, the communities of Pocahontas, Grant Fork, and Highland are a reasonable area to perform these analyses, and to include in the proposed class.  Bell Rept., Ex. 9 at 5.  Based on Dr. Bell's investigation and experience, this is a reasonable estimate of the potentially impacted communities in this case.  Bell Rept., Ex. 9 at 5.  Dr. Bell has determined that these communities exhibit commonalities such that any impacts on value from Plains' Silver Lake oil spill might be felt across this defined area.  Bell Rept., Ex. 9 at 9.

Put differently, these communities are reasonably likely to have experienced use damages:  ". . . I do think on a preliminary basis those three communities [Highland, Pocahontas, and Grant Fork] would be a likely candidate for the premium."  Bell Depo., Ex. 10 at 40 (alteration added).  *See also* Bell Depo., Ex. 10 at 104-05 *and* at 207-208 (Pocahontas, Grant Fork, and Highland are the most likely to have experienced a premium and thus use-category losses; ultimately "There could be pockets that don't show an impact, and other pockets that show a pronounced impact. . . .  That's the beauty of mass appraisal, is you can input all the data and you start getting answers to these kinds of questions.")

Dr. Bell grounds his opinion on numerous sources of information and established facts.  First of course is open and obvious fact of the crude oil spill itself, the resulting contamination of various ditches, Little Silver Creek, and Silver Lake.  Bell Rept., Ex. 9 at 4-5.  Dr. Bell also personally inspected the area on June 2018.  Bell Rept., Ex. 9 at 1, 9.  This included the area of

Plaintiffs' homes per GPS.  Bell Depo., Ex. 10 at 124-25.  Dr. Bell further sent another researcher from his firm, David Kader, to conduct a supplemental inspection of the area.  Bell Rept., Ex. 9 at 1.  Dr. Bell also reviewed the general media and government responses and reports on the Highland Lake crude oil spill.  Bell Rept., Ex. 9 at 1.  Thus he is generally familiar with class area (the Pocahontas, Grant Fork, and Highland communities).  Bell Rept., Ex. 9 at 1.

Based on all of this, Dr. Bell is confident he has been provided ample information to have properly identified the preliminary class area with reasonable specificity.  Bell Depo., Ex. 10 at 25-28.  Pocahontas, Grant Fork, and Highland are all geographically located close to  Little Silver Creek and Silver Lake.  Bell Depo., Ex. 10 at 31-32.  ". . . I'm familiar enough with the case to know that those communities are in close proximity to the stream and the lake."  Bell Depo., Ex. 10 at 32.  "[F]rom the information I've seen, the spill occurred in, you know, in Pocahontas, the pump station there, then when down into a stream into the lake that certainly encompassed into – into the area that I've talked about, the three communities referenced."  Bell Depo., Ex. 10 at 31-32.

### c.  Homogeneity: commonality and typicality of the class area

Dr. Bell has also inspected and reviewed enough materials to conclude the proposed class area is sufficiently homogenous to allow mass appraisal and other well accepted appraisal techniques.  Bell Rept., Ex. 9 at 9;  Bell Depo. 131-33.  Standing alone, confining the analysis to residential properties alone provides a great measure of homogeneity (*i.e.* commonality and typicality).  "[W]e're just looking at residential.  That, in and of itself, is an enormous commonality."  Bell Depo., Ex. 10 at 144.

The character of the Pocahontas-Grant Fork-Highland areas are also typical.  "[T]hey looked like they had ample utilities.  They looked like they had ample community amenities such

as the shopping and the restaurants and the schools and parks and churches and synagogues and things you would expect in a nice Midwestern town or region.  There were no surprises."  Bell Depo. 137.  *See generally* Bell Depo., Ex. 10 at 137-138, 143.

As explained above, variations in age of dwellings, lot size, distance to the grocery store, *etc.*, are no impairment to mass appraisal of the class area.  There are ample protocols to eliminate such issues through computer modeling and other procedures appropriate under USPAP.  *See generally* Bell Depo., Ex. 10 at 132-44.  These are all simply independent variables easily addressed by the process.  "[T]o the extent there are differences within the residential sectors, those are very easily adjusted for with a computer modeling.  I'm certainly aware of them."  Bell Depo., Ex. 10 at 139-40; 144.  This is true for the instant case as well.  "[F]rom my view of it, from the – from Dave Cater's view of it and from all indications, [(the Pocahontas-Grant Fork-Highland area)] is homogenous, differences certainly exist, but I don't see anything outside the realm of what's been done many times on a very creditable basis to do a mass appraisal technique."  Bell Depo., Ex. 10 at 143 (alteration supplied).

### 4.    The relevant class period should be until the present day

Crude oil pollution can impact communities both immediately and persistently.  For the reasons that follow, both in this section and the following section regarding the report and testimony of Dr. Gary Rand, Plaintiffs suggest the class period should extend into the present day.

### a.  The shutdown of Silver Lake

Among the other ills caused by Plains' oil spill, Silver Lake was closed to public use for nearly two weeks.  *See e.g.* Bell Depo., Ex. 10 at 38, 231.  By definition, that alone, constitutes a loss of use within the meaning of USPAP, and the class could be certified solely on that basis.

14

*Id.*

### b.  Regulatory clearance – nine months later

However, it is Dr. Bell's conclusion that absent further compelling evidence either way, a more appropriate measure would be the date that the Illinois EPA issued its provisional Return to Compliance letter to Plains on April 15, 2016 – nine months later:

> . . . [G]enerally speaking, the NFA letter or the closure letter is a definitive point where the issues, the environmental concerns and issues, somewhat come to an end. That's a very clear issue that I've seen within my area of expertise. As a real estate economist, I've seen that over and over again.
>
> There are exceptions to that. And to the extent that there are exceptions, I would want an environmental engineer to tell me what that exception is. But the No Further Action letter issuance is a very clear definitive benchmark of time that I've seen in many, many, many environmental cases, not just across the country, across the world.
>
> So that is an important date. And I'm not suggesting that that's cast in stone and not subject to change. But if there's gonna be a derivation from that date, I would want that expressed by an environmental engineer. I would, certainly, not be qualified to deviate from that date.
>
> Bell Depo., Ex. 10 at 53.

Invited by Plains to elaborate still further, Dr. Bell explained:

> Q. Can you explain to me, Dr. Bell, why that particular date is important to you -- that is the date of the No Further Remediation letter -- to your time period for this use effect that we were talking about, you know, 15 or 20 minutes ago, about loss of the use of the lake?
>
> Why is the date of that letter important?
>
> A:  Sure. Let me answer that question just a  more general way, and then I'll bring it to this case, specifically, if that's okay.
>
> You take a case like someone buying a service station and there's been a leak in an underground storage tank situation at the service station and someone thinking of buying the service station. But there's been a leak, there's been a remediation, but there's not yet an NFA, a No Further Action letter. Typically, you're gonna see some concern and -- well, that's the best way to put it.  There's gonna be some concern about that issue until the NFA is issued. Once the NFA is issued,

typically, again I'm talking generally, that concern is gone, it's over. And there, again, could be derivations from that date, the issue -- the letter might quite not be issued yet or the letter might be issued, but there's lingering issues that were caught within the scope of the NFA.

But, generally speaking, that's the time where the perspective buyer of the service station would have their concerns alleviated. And, again, generally, not always.

So turning to this case, specifically, with real estate appraisal we always assume a knowledgeable buyer and seller. We assume a knowledgeable market. And a knowledgeable person in the local market here around Silver Lake would know that there was a spill that's been in the media.

They would know -- if they were knowledgeable, they would know that Plains has, frankly, a sketchy reputation. Plains has been successfully criminally prosecuted. They don't have a good reputation in terms of being corporate neighbors. That's a part of their -- the full body of knowledge. And they would know that they are working on the spill.

And in terms of getting to that point of saying, Okay, this issue is over, again, typically, they would look at that closure letter from the EPA or IEPA as that same kind of reference point for saying we are okay. Are there derivations from that before or after, possibly. But I would take those from an environmental engineer. I would certainly not be in a position to pronounce them.

So I know -- I apologize for the long answer, but you asked a pretty large question. And I've done my best to summarize the essence of the answer.

Bell Depo., Ex. 10 at 53-56.

        **c.   In the face of complex and unresolved ecological risk issues, the class period should not be artificially curtailed**

As Dr. Bell stated throughout his deposition, further environmental study or other facts gained during merits discovery could affect his analysis.[9]  These lingering issues may go far beyond the scope of the Illinois EPA letter:

---

[9] As the Court will understand, it is utterly unremarkable for Dr. Bell (or any other expert) to state that further facts or reports may alter his opinions.  That is a fact of daily life in the law, and properly prudent.  Dr. Bell, however, is not a lawyer.  Bell Depo., Ex. 10 at 146.  Dr. Bell's way of expressing this was often speak of "preliminary" and "final" class areas, or similar.  During his deposition, Plains tried to make a lot of hay out of Dr. Bell's verbiage.  Plaintiffs trust the Court will not be confused by that tactic.

> [T]here could be, you know, the ducks or the geese – I don't know the hunting migration habits of waterfowl, they use the lake, there could be fish sampling of the lake, fishing from shore.  There's a host of things in terms of ecological systems that I am not an expert in that, you know – whether they did the proper sampling.  There's all kind of things that go on beyond or potentially could go beyond [the Illinois EPA] letter.  And that's why an environmental study needs to be done. . . .

Bell Depo., Ex. 10 at 83.

Further, the fact that, to the naked eye, all may appear well demonstrates nothing in and of itself.  That can easily prove up false: "For example, [there] are environmental cases where there's very serious issues, you know, issues going on but nobody knows about them. . . . [S]omeone could point the finger and say, well, there's no effect on use, everybody is enjoying the properties and the communities normally.  But had they known better, they certainly wouldn't have been out doing what they were doing . . .)".  Bell Depo., Ex. 10 at 94-95.

Such complex and unresolved common questions are present in this case, and for that reason, Plaintiffs urge the Court to certify the class for a period up to the present day.  In support the appropriateness of this, Plaintiffs offer the further opinions and testimony of Gary Rand, Ph.D.

### B.  Gary Rand, Ph.D.

To speak on such issues, Plaintiffs have also retained Professor Gary Rand, Ph.D.  From 1996 until his recent retirement, Prof. Rand has served as professor and Director of the Ecotoxicology and Risk Assessment Laboratory of Florida International University.  Rand C.V., Ex. 18 at 2.  Given Florida's diverse environmental makeup, Prof. Rand naturally has broad and deep experience in the ecotoxicology of freshwater, estuarine, marine, wetland, and terrestrial ecosystems.  *Id.*  Prof. Rand has edited numerous books and has over 170 or more different ecotoxicology papers/presentations to his credit.  *Id.* at 6-22.

As a distinguished academic and practical researcher, Dr. Rand has received grants (often multiple times) from governmental and administrative bodies as diverse as the U.S. National Park Service; the National Oceanic and Atmospheric Administration ("NOAA"); the U.S. Fish and Wildlife Service; the National Institute for Occupational Safety and Health ("NIOSH"); the U.S. EPA Gulf of Mexico Program; the State of Florida/Miami-Date County; and the South Florida Water Management District.  Rand C.V., Ex. 18 at 22-24.  Dr. Rand has also accepted testing and risk assessment assignments from numerous industrial, chemical, and crude oil manufacturing companies and conglomerates.  *Id.* at 24-25.

Dr. Rand's report identifies numerous common questions remaining open in this case. Broadly speaking, those issues include (but are certainly not limited to) (1) the physical, chemical, and environmental characteristics of the heavyweight crude oil Plains spilled here, Suncor Synthetic H Oil (sometimes called "OSH"); (2) the toxicity of Suncor Synthetic H Oil; (3) the transport of the crude oil spilled by Plains (in layman's terms: "Where did the oil go?"); (4) what physical, chemical, bio-reactive, or other changes (collectively known as "fate"[10]) may have occurred to the Suncor Synthetic H Oil here in the time since it was spilled into the environment; and (5) what effect has Plains' crude oil spill had on the ecology and environment of the Silver Lake region.  *See* Ex. 12-14, *passim.*

It is far beyond the purview of class certification proceedings to definitely answer such universal questions.  To do so will require some combination of appropriate modeling, testing, monitoring programs, and/or Ecological Risk Assessment(s), a formalized process for measuring

---

[10] A major component of fate is "weathering," the term used to encompass a wide variety of processes operating in the environment: Evaporation, emulsification, natural dispersion, dissolution, microbial degradation, photo-oxidation, sedimentation, and oil-suspended particle interactions.  Rand Rept., Ex. 12 at 6.

ecological risk, harm, and damage.  *See* Ex. 12-14, *passim*.[11]

The only way to properly asses the harm from environmental contamination or pollution is through a properly conducted Ecological Risk Assessment.  Rand Rebuttal, Ex. 14 at 2. Plains' principal environmental consultant (Dr. J. Keith Tolson) has admitted that to date Plains – who is, after all, the polluter – has not conducted an Ecological Risk Assessment.  *Id.*; Deposition of J. Keith Tolson (excerpt), Exhibit 19.[12]

As a result, the post-certification phase of discovery could include (1) further soil analyses for reference sites outside the zone of influence of the spill to determine creditable "background" concentrations; (2) comprehensive analyses of sediments in potential receiving waters (Little Silver Creek or Silver Lake), as well as plant and animal tissue for organisms in soils and aquatic systems; (3) time-related analyses of PAH concentrations in soil, sediment and water, and (4) an overall comprehensive monitoring plan.  Rand Rept., Ex. 12 at 11.

Owing to these open issues (and others), the Court should certify the class period through the present day.  There can be little practical harm in doing so.  If Plains' theories prevail, the correct result will still be reached.

### C.  Craig Meier, P.E.

Plaintiffs have retained Craig Meier, P.E., principally to help the jury understand pipeline operations (or answer questions the Court may have) and address related issues as they pertain to

---

[11] As detailed throughout, Suncor Synthetic H crude oil is classified as a heavyweight crude oil.  As the classification suggests, heavyweight crude oils contain higher concentrations of compounds with higher molecular weight and also have higher specific gravity.  Rand Rept., Ex. 12 at 4, 5-9.  In simplest terms, this means heavyweight oils have a propensity to sink in water, bind to sediment, and/or accumulate at the bottom of the water column.  *Id.* at 7-8.  Heavyweight crude oils also experience different fate/weathering than light- or medium-weight crude oils; they can be more resistant to weathering; prone to higher persistence in the environment; and bioaccumulate to high concentrations.  *Id.* at 5-9.

[12] Again, Plaintiffs reserve the right to seek to exclude Dr. Tolson's testimony.

this case, such as the Kiefner report.  Meier Rept., Ex. 15 *passim*.

Mr. Meier also conducted a survey of Plains' history of environmental disasters.  Beyond the aforementioned ~$275,000,000 Santa Barbara oil spill for which Plains was criminally convicted of a felony and several misdemeanors – occurring less than two months before the Silver Lake oil spill – Plains has polluted numerous other United States communities as well. *See* Meier Rept. at 6-8;  Exhibit 2.

## IV.  PROPOSED CLASS

Based on all the foregoing considerations and others as contained in the record Plaintiffs, on behalf of themselves and all others similarly situated, move the Court for certification of a Class pursuant to F. R. Civ. P. 23(a) and (b)(3), consisting of the following persons:

> All owners or lessees of residential properties in the Pocahontas, Grant Fork, and Highland Illinois communities, from July 10, 2015 to present.

> Excluded from this proposed class are: (1) Defendants, any entity or division in which Defendants have a controlling interest, and their legal representatives, officers, directors, employees, assigns and successors; (2) the judge(s) to whom this case is assigned, the judge's staff, and any member of the judge's family.

## V.  GENERAL REQUIREMENTS OF RULE 23

Rule 23(a) of the Federal Rules of Civil Procedure states:

> (a) Prerequisites to a Class Action. One or more members of a class may sue or be sued as representative parties on behalf of all only if: (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

F. R. Civ. P. 23(a).

The Supreme Court has said that the final three requirements of Rule 23(a) "tend to merge," with commonality and typicality "serv[ing] as guideposts for determining whether . . .

maintenance of a class action is economical and whether the named plaintiffs claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Gen. Tel. Co. v. Falcon*, 457 U.S. 147, 157 n.l3 (1982).

Rule 23(b)(3) of the Federal Rules of Civil Procedure provides:

A class action may be maintained if Rule 23(a) is satisfied and if:

> (3) the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:
>
> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
> (D) the likely difficulties in managing a class action.

F. R. Civ. P. Rule 23(b).

"A plaintiff who moves for class certification must satisfy the numerosity, commonality, typicality, and adequacy of representation requirements of Rule 23(a), as well as at least one subsection of Rule 23(b)." *Puffer v. Allstate Ins. Co*., 675 F.3d 709, 716 (7th Cir. 2012). While the determination whether to certify a class is left to the district court, *CE Design Ltd. v. King Architectural Metals, Inc*., 637 F.3d 721, 723 (7th Cir. 2011), "the court should not turn the class certification proceedings into a dress rehearsal for the trial on the merits." *Messner v. Northshore University HealthSystem*, 669 F.3d 802, 811 (7th Cir. 2012).

## VI.    RULE 23(a) FACTORS APPLIED TO THIS CASE

### A.  Numerosity

Plaintiffs need not demonstrate numerosity with absolute precision.  If plaintiffs are unable to provide an exact number, "a good faith effort is sufficient to establish the number of class members." *Jenkins v. Mercantile Mortg. Co.*, 231 F.Supp.2d 737, 744 (N.D.Ill. 2002).

Numerosity is readily satisfied here.  Historically, although no specific number is required, numerous courts have found the requirement satisfied when there are at least 40 class members.  *See, e.g., Chandler v. Southwest Jeep Eagle*, 162 F.R.D. 302, 307 (N.D. Ill. 1995). The class area is estimated to have over 4,400 households.  Bell Rept. Ex. 9 at 5.

### B.  Commonality

Rule 23(a)(2) sets forth the commonality requirement which ensures that the class is "reasonably homogeneous."  *Culver v. City of Milwaukee*, 277 F.3d 908, 910 (7th Cir. 2002). "The fact that there is some factual variation among the class grievances will not defeat a class action." *Rosario v. Livaditis*, 963 F.2d 1013, 1017-1018 (7th Cir. 1992).  Instead, a "common nucleus of operative fact is usually enough to satisfy the commonality requirement." *Id.* at 1018. Courts have found a common nucleus of operative fact in situations where a defendant has engaged in standardized conduct toward members of the class.  *Keele v. Wexler*, 149 F.3d 589, 594 (7th Cir. 1998).

Commonality is also easily satisfied here.  Common issues of fact or law include (1) the root cause(s) of the Silver Lake oil spill; (2) whether Plains acted negligently, recklessly, and/or maliciously with respect to inspection, repair, or maintenance of the pipeline and pump station; and (3) the nature and scope of the resulting harm.  This is entirely commonplace in an oil spill case.  *See, e.g., In re Oil Spill by Oil Rig Deepwater Horizon in Gulf of Mexico, on April 20, 2010* 910 F.Supp.2d 891, 915 (E.D. La. 2012), *aff'd sub nom. In re Deepwater Horizon* 739 F.3d 790 (5th Cir. 2014) ("the overarching questions of law and fact raised by the Deepwater Horizon

incident are common, recurring issues as they relate to the liability of BP and/or others . . . commonality is satisfied").

### C.  Typicality

A plaintiff's claim is typical "if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and his or her claims are based on the same legal theory." *De La Fuente v. Stokely-Van Camp, Inc.*, 713 F.2d 225, 232 (7th Cir. 1983).  Moreover, typicality is determined with reference to the defendant's actions, not the defenses it may have against particular plaintiffs. *CE Design*, 637 F.3d at 724-25.

As residential property owners in the class area, the claims of Cheryl Moor and David Medlock are typical of all other class members.  Precisely the same event gives rise to every class member: The Silver Lake crude oil spill.  Furthermore, Plains' course of conduct in failing to maintain the pipeline; failing to realize the risks; and failing to prevent the spill are courses of conduct which are and will be common to every class member.

And as also pointed out above, Dr. Bell's methodology, which proceeds according USPAP and other professional requirements, amply accounts for any minor variations in fact or circumstance among the entire class, including Plaintiffs themselves.  This obviates most, if not all, concerns about commonality.

### D.  Adequacy of Representation

The plaintiffs and their counsel satisfy the adequacy requirement.  The adequacy inquiry serves to uncover conflicts of interest between named parties and the class they seek to represent. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997).  Therefore, a determination of the adequacy of representation includes two inquiries: (1) whether any substantial conflicts of interest exist between the representatives and the class; and (2) whether the representatives will

23

adequately prosecute the action.

### 1. The named plaintiffs are adequate

As to named representatives, the adequacy requirement is satisfied where the named representative (1) has retained competent counsel, (2) has a sufficient interest in the outcome of the case to ensure vigorous advocacy, and (3) does not have interests antagonistic to those of the class. *Goldwater v. Alston & Bird et al.,* 116 F.RD. 342, 353 (S.D.Ill. 1987). In determining whether a class representative is adequate, the Court should keep in mind the admonition of the Seventh Circuit in *Eggleston v. Chicago Journeyman Plumbers Local Union No. 130*, 657 F.2d 890, 895 (7th Cir. 1981) to keep a close eye on defendants ("a bit like permitting a fox, although with a pious countenance, to take charge of the chicken house.").

Defendants often unfairly try to argue typicality by measuring the sophistication of the parties; their ability to explain complex legal terms of art; *etc.* All such arguments are inappropriate, and the sophistication of named plaintiffs is irrelevant to the adequacy analysis. The United States Supreme Court illustrated this well in *Surowitz v. Hilton Hotels Corp.*, 383 U.S. 363 (1966), where class certification was not defeated even though the named plaintiff (a Polish immigrant) did not understand the complaint at all; could not explain the statements in it; had little knowledge of what the lawsuit was about; did not know the defendants by name; or even the nature of the misconduct of defendants; and relied almost entirely on the explanations of her son-in-law. *Id.* at 366-72.

Here, both named Plaintiffs have actively participated in the litigation by taking the initiative to obtain counsel and file suit. They have also responded to Plains' discovery requests. Both also sat for lengthy depositions. *See* Deposition of Cheryl Moor, Ex. 21, and Deposition of David Medlock, Ex. 22. In short, Plaintiffs have demonstrated ample commitment to this action;

24

demonstrate no interests adverse to the proposed class or conflicts with the proposed class; and are adequate representatives.

### 2.    Class counsel is adequate

Plaintiffs' counsel satisfies the adequacy requirement.  Adequacy of representation also requires a showing that the action will be vigorously prosecuted.  Here, Plaintiffs' counsel has vigorously prosecuted this action, from filing the complaint, to pursing certification-related discovery, to obtaining well-qualified experts to render testimony in this case; taking and defendant numerous depositions; and more besides, as is evident on the record.

Counsel have demonstrated beyond cavil their ability and willingness to pursue this action to its conclusion.  *See* Newberg on Class Actions§ 3.24 at 3-133 n.353 (3d ed. 1992) ("[T]he single most important factor considered by the courts in determining the quality of the representative's ability and willingness to advocate the cause of the class has been the caliber of the plaintiff's attorney.").  Counsel here is well-versed in class action practice. Ex. 23.

## VII.    RULE 23(b)(3)'s REQUIREMENTS: Predominance and Superiority

Plaintiffs seek certification under Rule 23(b)(3).  Each of the factors under that Rule will be addressed below.

### A.  Predominance

Here, as in so many environmental cases, "[c]ommon issues of liability, causation, and remedies not only predominate but overwhelm individualized issues." *Boggs v. Divested Atomic Corp.*, 141 F.R.D. 58, 67 (S.D. Ohio, 1991).

"This case arises from the blowout of one well, on one date, and the discharge of oil from one location. It is therefore clear that the vast majority of the contested factual questions are common to all class members and that the case includes a number of issues whose resolution

'will resolve an issue that is central to the validity of each one of the class member's claims in one stroke.'" *Deepwater Horizon*, 910 F. Supp. 2d at 922 (quoting *Wal-Mart Stores, Inc., v. Dukes*, 564 U.S. 338, 350 (2011)). *See also Turner v. Murphy Oil USA, Inc.*, 234 F.R.D. 597, 606 (E.D. La. 2006) (in Hurricane Katrina oil pollution cases, rejecting defendant's argument that "oil did not spread uniformly throughout the affected area," where "the central factual basis for all of Plaintiffs' claims is the leak itself—how it occurred, and where the oil went. There is a large area of factual overlap in the Plaintiffs' causes of action.").

These and the common issues identified above will be the common and predominant issues in this case. Furthermore, as he explained, Dr. Bell's methodology will proceed according to USPAP standards for mass appraisals. This eliminates virtually all of the "individualized issues" arguments typically made by defendants such as Plains.

## B. Superiority

The superiority requirement is met when the plaintiff demonstrates that the class action is the superior method for adjudication of the controversy; this in turn is often satisfied when the plaintiff demonstrates that there is a standardized conduct by a defendant to the putative class members and a common nucleus of operative facts is present. *See Harris v. Circuit City Stores, Inc.*, 2008 WL 400862, at *8 (N.D. Ill. 2008). Courts may further the non-exhaustive factors of F. R. Civ. P. 23(b)(3)(A-D). Each favors certification here.

### 1. Members of the class have no interest in individually controlling their claim

Even on the face of it, environmental litigation is expensive, complex, and time-consuming. Plaintiffs Moor and Medlock are willing to shoulder the burden for all. There is no evidence that any putative class members are willing to pursue such claims and carry such burdens individually.

26

### 2.   The extent and nature of any litigation concerning the controversy already begun by or against class members

Plaintiffs are not aware of any other actions involving the same misconduct.  And, in any event, this case has already progressed significantly, with significant written discovery and deposition testimony having occurred, as well as retention of experts and submittal of expert evidence to the Court.

### 3.   It is desirable to control the litigation in this forum

The litigation should be concentrated in this Court as this case has proceeded here since its inception. The Court has presided over motion practice and discovery matters and should be well-familiar with the claims asserted in this lawsuit.  The centrality of this case is Silver Lake and the associated communities of Pocahontas, Grant Fork, and Highland.

### 4.   No management difficulties are present

This case presents no management significant managements difficulties.  Again, the case is centered locally, an thus, there will be no difficulty identifying or communicating with the vast majority of class members.

## VIII.  CONCLUSION

Plains polluted the Silver Lake area, to the detriment of local residents.  Proceeding with this case will provide those area residents both redress and comfort in confronting this contamination in a final way.

WHEREFORE, Plaintiffs respectfully request the Order of the Court CERTIFYING a class in this case as set forth in Plaintiffs' motion for the same, and for such other and further relief as this Court deems just and proper.

Respectfully submitted,
THE DRISCOLL FIRM, P.C.

BY:      /s/ Gregory J. Pals
              JOHN J. DRISCOLL (6276464)
              GREGORY J. PALS (6271778)
              THE DRISCOLL FIRM, P.C.
              211 North Broadway, Suite 4050
              St. Louis, Missouri 63012
              Telephone No. (314) 932-3232
              Fax No. (314) 932-3233

## CERTIFICATE OF SERVICE

I hereby certify that on January 11, 2019 the foregoing was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system upon all parties of record in this case.

                                              /s/ Gregory J. Pals