## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **CHERYL MORR and** ) | |
| **DAVID MEDLOCK, On Behalf of** ) | |
| **Themselves and All Others Similarly** ) | |
| **Situated,** ) | |
| ) | **Case No. 17-cv-163-SMY** |
| **Plaintiffs,** ) | |
| ) | |
| **vs.** ) | |
| ) | |
| **PLAINS ALL AMERICAN PIPELINE,** ) | |
| **L.P., and PLAINS PIPELINE L.P.,** ) | |
| ) | |
| **Defendants.** ) | |

## MEMORANDUM AND ORDER

**YANDLE, District Judge:**

Plaintiffs Cheryl Morr and David Medlock, individually and on behalf of all similarly situated persons, filed the instant putative class action against Defendants Plains All American Pipeline, L.P. and Plains Pipeline, L.P., ("Plains"). Plaintiffs assert claims under the Oil Pollution Act, 33 U.S.C. §§ 2701, *et seq*. and state law claims for negligence, nuisance, and trespass arising from an oil spill that occurred on July 10, 2015 (Doc. 1). They have moved to certify the class (Doc. 75), which Plains opposes (Doc. 81). To support of their motion for class certification, Plaintiffs rely on the reports and opinions of their three retained experts: Craig Meier, Gary Rand, and Randell Bell.

Now pending before the Court are Defendants' motions to exclude Plaintiffs' experts (Docs. 83, 84, and 85). Plaintiffs have filed responses (Docs. 91, 92, and 93). For the following reasons, the motions to exclude are **GRANTED in part and DENIED in part**.

### Background

This case arises from a July 10, 2015 spill of approximately 100 barrels of crude oil from

a failed tubing fitting at Plains' Pocahontas Pump Station. The Pump Station is located approximately 2.6 miles west of Pocahontas, Illinois and 6 miles northeast of the residential areas of Highland, Illinois.  Following the spill, approximately 56 barrels were recovered as a result of Plains' cleanup efforts.  The spill response and cleanup were overseen by regulators including, the U.S. Environmental Protection Agency ("USEPA"), Illinois Environmental Protection Agency ("IEPA"), and the City of Highland.

The Pump Station is surrounded by rural land.  The pathway of the spill stayed confined in a ditch leading away from the Pump Station, a tributary into which the ditch fed, and Silver Creek. The oil did not extend beyond the Pump Station property or the Silver Creek shoreline.  The Release physically touched approximately 19 residential properties along the banks of a creek that widened behind a dam to form Silver Lake further downstream.  The Release caused a temporary 12-day closure of Silver Lake's public boat ramp to facilitate the spill response efforts.

The owners of 8 residential properties along the creek reached settlements with Plains for claims related to the Release.  Plaintiffs, the owners of two tracts of the residential properties, filed this putative class action lawsuit seeking to recover for the following claims: the Oil Pollution Act of 1990, 33 U.S.C. § 2701 et seq. ("OPA") (Count I); trespass (Count II); negligence (Count III); negligence *per se* (Count IV); public nuisance (Count V); and continuing public nuisance (Count VI).

Plaintiffs have moved for class certification under Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure and seek to represent the following class:

> All owners or lessees of residential properties in the Pocahontas, Grant Fork, and Highland Illinois communities, from July 10, 2015 to present. Excluded from this proposed class are: (1) Defendants, any entity or division in which Defendants have a controlling interest, and their legal representatives, officers, directors, employees, assigns and successors; (2) the judge(s) to whom this case is assigned, the judge's staff, and any member of the judge's family.

Defendants urge the Court to exclude the opinions proffered by Plaintiffs retained expert witnesses in support of class certification.

### Discussion

Federal Rule of Evidence 702 provides for the admission of expert testimony that assists the trier of fact to understand the evidence or to determine a fact in issue. Fed.R.Evid. 702. District courts have a "gatekeeping" obligation to ensure that expert testimony is both relevant and reliable. Fed. R. Evid. 702; *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (2003); *Lees v. Carthage College,* 714 F.3d 516, 521 (7th Cir. 2013). Essentially, the Court must answer three questions before admitting expert testimony: (1) is the expert qualified; (2) is the expert's methodology reliable; and (3) will the expert's testimony assist the trier of fact in understanding the evidence or determining a fact in issue. *Myers v. Illinois Cent. R. Co.*, 629 F.3d 639, 644 (7th Cir. 2010). The party offering the expert testimony bears the burden of proof as to relevance and reliability. *Brown v. Burlington N. Santa Fe Ry. Co.*, 765 F.3d 765, 772 (7th Cir. 2014) (citing *Lewis v. CITGO Petroleum Corp.,* 561 F.3d 698, 705 (7th Cir. 2009)).

When an expert's report or testimony is "critical to class certification," the Court must make a conclusive ruling on any challenge to that expert's qualifications or submissions before it may rule on a motion for class certification. *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 812 (7th Cir. 2012); *see also American Honda Motor Co. v. Allen*, 600 F.3d 813, 815-16 (7th Cir. 2010). The term critical is interpreted broadly and describes expert testimony important to an issue decisive for the motion for class certification.

### Craig B. Meier (Doc. 83)

The U.S. Department of Transportation Pipeline and Hazardous Materials Safety Administration ("PHMSA") required Plains to prepare a report following the spill. Plains engaged third party Kiefner and Associates to prepare the report which identified the root causes of the

Release and offered recommendations on potential post-Release remedial measures. On April 15, 2016, based on the Kiefner Report, the Illinois Environmental Protection Agency concluded that Plains' response to the Release had addressed the causation and remediation issues associated with the spill, and closed its file.

Plaintiffs retained Craig B. Meier "to help the jury (and the Court if need be) understand the operational and technical details of pipeline management and operations, including the interpretation of the Kiefner Report." Meier has a B.S. in mechanical engineering and over 27 years of petroleum pipelines and terminals industry experience. He has served in various capacities in the industry, including senior pipeline engineer, senior project engineer, director of engineering and reliability, director of fixed equipment integrity, vice president of operations in engineering and general manager of engineering. Meier holds several engineering related licenses, certifications, and has acquired specialized training.

Meier's opinions primarily consist of providing criticisms and identifying alleged gaps in the Kiefner Report and providing commentary regarding the Report's conclusions. For his report, Meier also prepared a survey regarding prior incidents where oil was released from other pipelines or facilities owned by Plains. He obtained information regarding the prior incidents from PHMSA's website and news stories he found on the Internet. The prior incidents referenced in his report occurred at different times, in different facilities around the country, and under various factual circumstances.

Defendants argue that Meier is not qualified to render an opinion on the Kiefner Report because he did not perform a root cause analysis of the Release. They also argue that Meier's opinions regarding the Report should be excluded because they amount to nothing more than summarizing the Report's conclusions, identifying alleged gaps and providing commentary.

Meier has over two decades of experience in pipeline management and operation.  As such, he has the requisite background and experience to render opinions regarding pipelines and the completeness of the Kiefner Report, regardless of whether he formally participated in a root cause analysis.  An expert is free to rely on data and other information supplied by third parties.  *Dura Automotive Systems of Indiana, Inc. v. CTS Corporation,* 285 F.3d 609, 612 (7th Cir. 2002).  Analyzing data assembled by others is neither illicit nor unusual, even if the data were prepared for litigation by an interested party.  *Walker v. Soo Line Railroad Co.,* 208 F.3d 581, 588 (7th Cir. 2000).  This is precisely what Meier has done.  The weight and credibility to be accorded to his conclusions based on his analysis of the Report are factual matters to be determined by the trier of fact.  *See Daubert*, 509 U.S. at 596.  The Court is satisfied that his methodology is sound.

Next, Defendants contend that Meier's opinions regarding prior incidents are irrelevant to Plaintiffs' class certification issues.  The Court agrees.  In assessing the relevance of proposed expert opinions, the court must ensure they will "assist the trier of fact to understand the evidence or determine a fact in issue."  *Daubert*, 509 U.S. at 591.  In other words, "the suggested ... testimony must 'fit' the issue to which the expert is testifying."  *Chapman*, 297 F.3d at 687 (citation omitted).  None of the prior incidents were caused by the same failure that caused the spill in question. That being the case, references to other oil spills that occurred under substantially different circumstances, at different times, in different areas, will not assist the Court to resolve questions at issue.  Meier's opinions regarding the previous incidents are therefore irrelevant and will be excluded.

### Dr. Gary M. Rand (Doc. 84)

Plaintiffs retained Dr. Gary Rand to evaluate the environmental consequences of the spill. Rand has a BA in biology, a Ph.D. in biology with a specialty in environmental toxicology, and a

MS in marine science. He has over forty years' experience in environmental toxicology and ecological risk assessment with positions in industry and academia and as a consultant on behalf of private and public clients.  Rand has published peer-reviewed scientific journal articles, textbooks, and has taught undergraduate and graduate level courses in ecotoxicology.  He is currently the Professor and Director of the Ecotoxicology & Risk Assessment Laboratory in the Department of Earth and Environment at Florida International University.

For this case, Rand reviewed literature from scientific journals and government and industry reports and websites.  He analyzed Polycyclic Aromatic Hydrocarbons ("PAHs") in soil samples collected from Teklab, Inc. from 17 locations on March 22, 2018 and soil and sediment samples from Terracon, Inc collected on March 15, 2015.  Based on a summary of the literature on the characteristics of different weight crude oils, information on the Suncor Synthetic H oil that was released during the spill, and the analytical chemistry monitoring data of PAHs from soil samples of residences in the area of the spill, Rand formulated the following relevant opinions:

(1) Following Plains' crude oil spill in 2015, the oil had less potential for producing acute toxicity via exposure of BTEX to soil and aquatic organisms.

(2) Because of the significant presence of the toxic and persistent PAHs in Suncor Synthetic H oil after the spill, it is likely that the spill increased concentrations of these components in soils.

(3) The analytical data (Teklab Inc. 2018) for the 17 soil samples of PAH concentrations (for 16 different PAHs) in soils around the residences indicate the presence of 2 or more PAHs in 11 of the 17 soil samples and from at least 5 and up to 12 different PAHs from 7 of the 11 samples.  The samples indicate exposures that may threaten natural resources of concern and could place exposed organisms at risk. The concentrations of PAHs on soil and sediment can remain and persist on soils and sediments, potentially for years producing long-term exposures and accumulate in exposed organisms (i.e., through food chain) causing long-term chronic effects and high risk. Accumulation of these components by people as a result of their potential consumption of contaminated food (e.g., contaminated fish from exposed bodies of water) can have long-term implications.

(4) Plains' activities as identified in the Terracon report were insufficient to address the numerous potential problems, environmental harms, and hazards to life/health presented by the Highland oil spill.

Rand also opines that the class period should extend to the present day because numerous common questions remain open in this case including, (1) the physical, chemical, and environmental characteristics of the heavyweight crude oil from the Release;(2) the toxicity of oil; (3) the transport of the crude oil spilled by Plains; (4) what physical, chemical, bio-reactive, or other changes may have occurred to the oil in the time since the Release; and (5) what effect has the Release had on the ecology and environment of the Silver Lake region.

Plains challenges the reliability of Rand's opinions.  They contend that Rand does not have any evidentiary basis to conclude to a reasonable degree of scientific certainty that oil or degradation products of the oil from the release are currently present in either Silver Creek or Silver Lake.  *Daubert* demands reliability, not perfection.  In other words, the reliability inquiry under *Daubert* "is primarily a question of the validity of the methodology employed by an expert, not the quality of the data used in applying the methodology or the conclusion produced." *Manpower, Inc. v. Ins. Co. of Pennsylvania,* 732 F.3d 796, 806 (7th Cir. 2013).  Questions related to the quality of the underlying data and the expert's conclusions are not a proper consideration in assessing the reliability of the expert's methodology.  *Id*.

As to reliability, the Court is satisfied that Rand properly supported his conclusions based on his review of the evidence and claims submissions.  He explained his methodology, including how he compared the PAH soil concentrations to National Oceanic and Atmospheric Administration screening table values for PAHs in freshwater sediment.  He also explained the basis of his opinions from his review and analysis of Suncor Synthetic H oil by comparing it with other heavy weight oils and their characteristics.  He properly relied on literature and information

contained in peer reviewed sources.  Accordingly, Plains' motion is denied in its entirety as to Rand.

### Dr. Randall Bell (Doc. 85)

Plaintiffs retained Dr. Randall Bell to conduct an analysis of damages for residential property owners impacted by the spill in the future. Bell has a B.S. in finance an accounting, an MBA with a real estate emphasis, and a Ph.D. focusing on socioeconomics.  He is a real estate economist and a licensed appraiser and is a member of the Appraisal Institute.  He is the principal and CEO of a consulting and appraisal firm that specializes in real estate damage economics.  Bell has more than thirty years of experience in appraisal, consulting and research regarding residential, land, commercial, special purpose, retail industrial, recreational, and investment properties in several states and internationally.  Since 1992, he has specialized in real estate damage economics; valuation issues related to a variety of detrimental conditions, including environmental issues, geotechnical issues, distress conditions, construction defects, and natural disasters.

Bell reviewed various background and supporting documents regarding Plains and the release, performed a literature review, preliminarily inspected Silver Lake and the surrounding area, and reviewed the Uniform Standards of Professional Appraisal Practice and other literature. Bell's Declaration contains two opinions:

(1) the residential class of properties defined in the Complaint exhibit commonalities such that any economic impacts, if any, on value from environmental contamination could be measured using generally accepted appraisal techniques. For example, there is an identifiable source of contamination and an area of common property types (e.g., residential). Comparisons can be made between impacted properties, and otherwise similar un-impacted properties.

(2) As a result of my research, personal inspections, literature review, and analysis, the impact on the value of the subject properties resulting from the Highland Silver Lake contamination, if any, can be accurately determined using mass appraisal techniques such as standard regression, paired-data, case study, and other techniques. Indeed, there is ample market data such that this case is ideally suited

for analysis by well-accepted appraisal techniques. It is not necessary to value such impacts on a property-by-property basis.

Bell proposes utilizing a standard mass appraisal (regression model) for measuring the impacts, if any, of the environmental damages in this case.  According to Bell, mass appraisal is a methodology that is widely accepted within the profession, its professional standards, and by peers. Bell further opines that he expects a "lake amenity premium" in real property value associated with a water amenity may exist for residential property located within several miles of Silver Lake.

Plains argues that Bell has not performed any significant case specific data collection, data analysis, model design or development, or other testable application of mass appraisal to the facts of this case but instead relies on his experience and education to proffer his opinion.  Plains further argues that Bell's mass appraisal methodology is unreliable because it cannot be constructed to take into account known pre-existing ecological damage nor alternate sources of contamination and he has not demonstrated that his model will have an acceptable error rate.  Additionally, Plains asserts that Bell's "lake amenity premium" opinion is unreliable, does not measure a legally compensable form of damages and therefore is irrelevant.

Bell admits that he has not constructed a mass appraisal model – he has not even started an analysis (Doc. 82-16, pp. 39-40; 108).  Nor has he done any site-specific data analysis, researched the available residential data necessary to run his model, preformed any quantitative appraisal or other valuation analysis for anyone in the proposed class; or evaluated Highland, Pocahontas, or Grantfork to test for the existence of the "lake amenity premium" for properties within a few miles of Silver Lake.  He merely offers the opinion that the residential class of properties defined in the Complaint exhibit sufficient commonalities such that a mass appraisal analysis could be used on a class-wide basis to determine losses.  While Plaintiffs concede that Bell has only proposed a methodology for further investigation, they argue that all they are required to do at this juncture is

"propose an accepted methodology to investigate the truth" of their environmental contamination case.

Similar arguments have been rejected as unreliable by district courts in this Circuit. *See, e.g.*, *In re Fluidmaster, Inc.*, No. 14-cv-5696, 2017 WL 1196990, at *28–29 (N.D. Ill. Mar. 31, 2017) (flaws in a proposed sample design make survey evidence unreliable); *Bowman v. Int'l Bus. Mach. Corp.*, 1:11-cv-0593 RLY-TAB, 2013 WL 12290828, at *5 (S.D. Ind. Aug. 16, 2013); *see also In re ConAgra Foods, Inc.*, 302 F.R.D. 537, 551–52 (C.D. Cal. 2014). In *ConAgra*, the plaintiffs argued that there proposed regression model was sufficient at the class certification stage. 302 F.R.D. at 552. In rejecting the plaintiffs' argument, the court held:

> [Plaintiffs' expert] does not provide a damages model that lacks certain variables or functionality. Rather, ***he provides no damages model at all***. Although the methodologies he describes may very well be capable of calculating damages in this action, [plaintiffs' expert] has made no showing that this is the case. ***He does not identify any variables he intends to build into the models, nor does he identify any data presently in his possession to which the models can be applied***. The court is thus left with only [the expert's] assurance that he can build a model to calculate damages. Stated differently, ***his declaration is so incomplete as to be inadmissible as irrelevant***. . . . Accordingly, the court finds that [plaintiffs' expert's] declaration does not satisfy the requirements of Rule 702. *Id.* at 552–53 (emphasis added).

The court's reasoning in *ConAgra* applies here. Bell has conducted preliminary mass appraisal model development as part of his class certification opinions in other cases but provides no model development or analysis specific to this case. And although Bell may have the requisite experience and education, there must be a link between the facts or data the expert has worked with and the conclusion the expert's testimony is intended to support. *United States v. Mamah*, 332 F.3d 475, 478 (7th Cir. 2003); *see also United States v. Parra,* 402 F.3d 752, 758 (7th Cir. 2005). Bell's failure to complete even a limited demonstration of his model's application to the facts of this case deprives the Court of the opportunity to assess his model's reliability based on accepted quantitative metrics—metrics that Bell himself uses to assess the reliability of mass

appraisals created by others.  Bell's conclusory "promise" of a reliable damages model – made without the support of any analysis of the relevant case-specific facts – does not pass muster under Rule 702 and *Daubert*.  Accordingly, Plains' Daubert Motion is granted as to Dr. Randall Bell.

### Conclusion

For the foregoing reasons, Defendant's Motion to Exclude Craig Meier (Doc. 83) is **GRANTED** in part and **DENIED** in part; Plains' Motion to Exclude Gary Rand (Doc. 84) is **DENIED**; and Plains' Motion to Exclude Randell Bell (Doc. 85) is **GRANTED**.

**IT IS SO ORDERED.**

**DATED:  September 30, 2021**

**STACI M. YANDLE**
**United States District Judge**